TJS:MH:DSM
F.# 2002R00706

- - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                     03-CR-725 (S-1)(JS)

JOHN AMBROSIO,
    also known as "Johnny Boy," and
MICHAEL GUERRIERI,
    also known as "Mikey Brooklyn"
  and "Mikey Gal,"

            Defendants.

- - - - - - - - - - - - - - - - - - X

## THE GOVERNMENT'S MOTION <u>IN LIMINE</u> <u>TO ADMIT CERTAIN EVIDENCE</u>

ROSLYNN R. MAUSKOPF
United States Attorney
Eastern District of New York

By:  Mitra Hormozi
     Deborah Sue Mayer
     Assistant U.S. Attorneys
     *(Of Counsel)*

Table of Contents

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . 1

I.   Factual Background . . . . . . . . . . . . . . . . . . . 3

II.  Argument . . . . . . . . . . . . . . . . . . . . . . . . 6

     A.   Organized Crime Expert . . . . . . . . . . . . . . 6

     B.   Evidence of Uncharged Predicate Acts in Support of the
          Charged Racketeering  . . . . . . . . . . . . . . 13

          1. Legal Standard . . . . . . . . . . . . . . . . 14

          2. The Uncharged Crimes are Evidence of the
             Charged Conspiracy . . . . . . . . . . . . . . 17

               a.  Illegal gambling with Phillips and Others   18

               b.  Other extortions and illegal gambling  . .  18

               c.  Ambrosio's and Guerrieri's prior
                   incarceration . . . . . . . . . . . . . . 19

          3. These Other Crimes are Also Admissible Pursuant
             to Federal Rule of Evidence 404(b) . . . . . . 19

               a.  The Second Circuit's inclusionary approach   20

               b.  Evidence offered to show background,
                   complete the story, and show relationships
                   of trust under 404(b) . . . . . . . . . . 21

          4. The Probative Value of the "Other Crimes"
             Evidence Far Outweighs Any Prejudicial Effect . 24

     C.   Admission of Coconspirator Statements . . . . . . 25

     D.   Evidence Regarding the Rehabilitation of the
          Government's Cooperating Witnesses . . . . . . . . 32

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . 35

i

## PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in support of its _in limine_ motion to secure rulings regarding the admission of certain evidence, including uncharged criminal conduct committed by defendants John Ambrosio and Michael Guerrieri.  As set forth below, evidence pertaining to criminal conduct not charged in the indictment is offered as direct proof of the enterprise charged in the indictment and the defendants' connection to and participation in it.  As such, it is not necessary to employ a Rule 404(b) analysis.  However, this evidence is also admissible under 404(b) because it is offered for many permissible bases including, motive, intent, opportunity, identity, plan and absence of mistake.

Further, cooperating witness testimony offered to prove the existence and membership of the Gambino family and the defendants' roles in it is expected to include co-conspirator statements, that is, statements made by members and associates of the Gambino family, including consensually recorded conversations of members and associates of the Gambino family as well as wire-tap recordings capturing members and associates of the Gambino family discussing Gambino family business.  Rulings as to the admissibility of co-conspirator statements will necessarily depend on the evidence at trial; but nonetheless, the government sets forth the relevant case law in anticipation of defense

1

objections.  As described below, such statements are properly admitted in this matter.

The government also seeks to secure pre-trial rulings regarding the following: testimony of an organized crime expert and evidence that would tend to rehabilitate the government's cooperating witnesses should their credibility be attacked by defense counsel.  For the reasons set forth below, the Court should grant the government's motion.

I.   **Factual Background**

The defendants John Ambrosio and Michael Guerrieri are charged with a collection of unlawful debt racketeering conspiracy as well as loansharking conspiracy and loansharking.

Michael Guerrieri is a longstanding member of the Gambino family.  Guerrieri's brother Anthony Guerrieri, also known as "Tony Lee," was also a member of the Gambino family and he effected Guerrieri's induction into the Gambino family. Defendant Guerrieri assisted his brother Tony Lee in an illegal gambling operation prior to Tony Lee's death.  After Tony Lee's death in February 1993, Guerrieri was put under Peter Gotti. When Gotti was elevated to acting boss, Guerrieri was placed under Dominick Pizzonia, also known as "Skinny Dom."

John Ambrosio is an associate of the Gambino family. He is involved with Guerrieri in various criminal activity including loansharking.  In approximately 1994, Guerrieri and Ambrosio became involved in an illegal gambling business with Chris Phillips and Joel Schwartz.  Ambrosio first met Phillips because Phillips and Schwartz wanted the protection of organized crime to help them both expand their gambling operation and better collect debts from gamblers.  Ambrosio introduced Phillips to Guerrieri and Guerrieri put Phillips "on record" with him. Phillips agreed to pay ten percent of his and Schwartz's net winnings to Ambrosio and Guerrieri each week.  Phillips would

3

meet Guerrieri once a week to discuss the gambling business and to give him money.  At some point, Ambrosio introduced Phillips to an individual named Sal Gerrato.  When Ambrosio made the introduction, he told Phillips that Gerrato was "with" Joseph Giordano, a made member of the Gambino family.  Gerrato eventually became a "runner" for the gambling business.

Schwartz also ran a gambling business in Florida in which Guerrieri, Ambrosio, Phillips and Schwartz each owned 25%. On one occasion, in Ambrosio's social club, the Huntington Men's Club, Ambrosio punched and kicked Schwartz over money he believed Schwartz owed regarding the gambling business in Florida. Eventually, Phillips ended his relationship in the gambling business with Schwartz and Guerrieri told Phillips that Phillips was indebted to him because he (Guerrieri) had "chased" away Schwartz.

When the gambling business declined, the arrangement between Phillips, Ambrosio and Guerrieri changed to Phillips paying Ambrosio and Guerrieri $500 a week.

Guerrieri and Ambrosio were also partners in a loansharking business.  They would loan money at usurious rates - one to three percent a week -- and often collected from debtors out of a convenience store located in Huntington.[1]  In

---

[1]  For example, on a loan of $1,000 at 3% or 3 points per week, the defendants would collect $30 per week or $1560 per year, with no reduction in principal.

4

approximately 1995, Phillips began to borrow money from Ambrosio and Guerrieri.  Between 1995 and 1999, Phillips borrowed money from Ambrosio and Guerrieri on numerous occasions paying anywhere between one to three points in interest every week.  With respect to the majority of the money, Guerrieri told Phillips the money was from Gene Gotti's loanshark book that was held by Gambino family associate Anthony Ambrosio.  Phillips was further told that Anthony Ambrosio was with Peter Gotti and Phillips understood this to mean that Peter Gotti had an interest in the collection of the money.  On one occasion, Guerrieri told Phillips the money came from Johnny Green, a member of another organized crime family.  When Phillips fell behind in his payments, Guerrieri  told Phillips that all five families would be coming down on him if he didn't repay the loans.

In approximately 1996, both Ambrosio and Guerrieri were incarcerated for separate crimes.  Phillips visited Guerrieri in prison.  Guerrieri directed Phillips to pay the $500 a week for protection of the gambling business to John Ambrosio's family because they needed the money more than Guerrieri did.  Guerrieri further instructed Phillips to make his weekly loanshark payments to Anthony Ambrosio at Delta Collision.  As directed, Phillips paid the gambling money to John Ambrosio's family and his loanshark payments to Anthony Ambrosio.  When Guerrieri was released from prison, he agreed to lower the weekly protection

5

payments that Phillips paid to $300.

Phillips also helped Ambrosio and Guerrieri collect money from others who owed them money on a few occasions.  For example, on one occasion Phillips and another individual went to Canada in an attempt to extort money from a business man for Ambrosio and Guerrieri.

## II.   **Argument**

### A.   Organized Crime Expert

The government seeks to admit at trial the testimony of an Special Agent Gregory Hagarty as an expert witness concerning the existence, nature and structure of La Cosa Nostra ("LCN") and, in particular, the Gambino family.[2]   Agent Hagarty will identify photographs of ranking members of the Gambino family. In addition, the expert will identify voices on a tape-recorded conversation and will offer opinions as to the topic of the cryptic and coded references by the individuals on the tape.

Under Federal Rules of Evidence 702, an expert is permitted to testify in the form of an opinion or otherwise when that testimony would assist the trier of fact to understand the evidence or to determine a fact in issue.   See Fed. R. Evid. 702.[3]

The Second Circuit has deemed "organized crime" to be a

_____

[2] As noted in the government's May 11, 2005 letter notifying counsel of Agent Hagarty's credentials, Agent Hagarty has extensive experience working on organized crime cases; he has listed to over 1,000 hours of wiretap recordings of members and associates of organized crime and he has been qualified as an expert on organized crime on a number of occasions, including United States v. Carneglia, 00 CR 638 (JM), aff'd, 47 Fed. Appx. 27 (2d. Cir. 2002) and United States v. Gotti, 02 CR 606 (FB).

[3]    Federal Rule of Evidence 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

relevant subject area for expert testimony and numerous courts have held that the admission of testimony from an expert witness is proper as to the nature, structure and methods and terminology of organized crime.  See United States v. Carneglia, 47 Fed. Appx. 27, 32-33 (2d Cir. 2002); United States v. Amuso, 21 F.3d 1251, 1263 (2d Cir. 1994); United States v. Locascio, 6 F.3d 924, 938 (2d Cir. 1993); United States v. Daly, 842 F.2d 1380, 1388 (2d Cir. 1988).  For example, in United States v. Locascio, 6 F.3d 924, 937 (2d Cir. 1993), the Second Circuit held:

> despite the unfortunate fact that our society has become increasingly familiar with organized crime and its activities from [the media], it is still a reasonable assumption that jurors are not well versed in the structure and methods of organized crime families.  Moreover, much of the information gleaned from such sources may be inaccurate.

Further, the government is aware that the use of such testimony is not without limits and consistent with the case law in this circuit and others, the government will respect those limitations.  For example, expert testimony cannot be used to improperly bolster the testimony of fact witnesses.  See United States v. Cruz, 981 F.2d 659, 663 (2d Cir. 1992) (prosecution should not attempt to bolster the credibility of fact witness by arguing that fact witness's version of events is consistent with expert's testimony).  Second, while organized crimes experts have been permitted to identify defendants as members of organized

crime, such testimony has been problematic at times.  See United
States v. Angiulo, 847 F.2d 956, 975 (1st Cir. 1988) (permitting
expert witness to identify two defendants as "close associates"
of the Patriarca family of LCN); United States v. Theodoropoulos,
866 F.2d 587, 589-92 (3d Cir. 1989) (permitting expert witness to
testify regarding defendant's rank and function within
conspiracy's hierarchy); cf. United States v. Scopo, 846 F.2d
135, 140 (2d Cir. 1988) (holding that, where expert used
statutory language and concluded that defendants were guilty, he
had made highly prejudicial legal conclusions).

          Consistent with these principles, the government
intends to follow careful limits on the use of the proposed
expert's testimony.  The government will not, for example, argue
in its summation that fact witnesses should be credited because
their testimony is consistent with that of the expert.  Moreover,
during the agent's direct testimony, we will not seek to identify
the defendants as either members or associates of the Gambino
Family.  Rather, the government will seek only to have the expert
explain the general structure and methods of all LCN families,
and part of the particular history of the Gambino Family and ask
the expert to identify a limited number of coconspirators as
members or associates of the Gambino family.

          Further, the government intends to ask Agent Hagarty
about one recorded conversation between Gene Gotti and Dominick

9

Pizzonia in which defendant Guerrieri's nickname is mentioned regarding a cryptic and coded topic.  The admissibility of expert testimony to interpret wiretap conversations and other evidence is well established.[4]  For example, in <u>United States v. Nersesian</u>, 824 F.2d 1294, 1307 (2d Cir. 1987), the Court upheld the admissibility of a D.E.A. agent's interpretation of a wiretap conversation concerning narcotics dealing.  The agent in <u>Nersesian</u> "drew upon his specialized knowledge and experience to explain patterns of speech and language that, in his experience, narcotics dealers commonly use in their conversations, including pauses, vagueness and excessive use of pronouns." <u>Id</u>.; <u>see</u> <u>also</u>, <u>e.g.</u>, <u>United States v. Ruggiero</u>, 928 F.2d 1289, 1305 (2d Cir. 1991) (no error in allowing expert to testify to "conclusions and interpretations" regarding cryptic tape-recorded conversations, where expert did not attempt to state ultimate legal conclusions based on tapes, and court gave appropriate cautionary instructions to jury); <u>United States v. Carmona</u>, 858 F.2d 66, 69 (2d Cir. 1988) (Rule 702 permits testimony of law enforcement agent experts to explain coded language related to narcotics

---

[4]  Agent Hagarty has been qualified as an expert on organized crime on several occasions, including in <u>United States v. Carneglia</u>, 00 CR 638 (JM), <u>aff'd</u>, 47 Fed. Appx. 27 (2d. Cir. 2002), and in <u>United States v. Gotti</u>, 02 CR 606 (FB).  In both instances Agent Hagarty discussed the contents of wiretaps and in <u>Gotti</u>, Agent Hagarty testified about the very same recording the government intends to use at this trial, albeit different portions of that recording.

dealing); <u>United States v. Kusek</u>, 844 F.2d 942, 949 (2d Cir. 1988) (testimony likely helpful to jurors unfamiliar with phrases used to obscure illegal activities); <u>United States v. Daly</u>, 842 F.2d 1380, 1388 (2d Cir. 1988) (citing use of experts to explain organized crime jargon and coded language); <u>United States v. Gambino</u>, 835 F. Supp. 74, 76 (E.D.N.Y. 1993)(government's expert witness explained cryptic references and organized crime jargon heard in tape recorded conversations which were intercepted at the Ravenite, a Gambino family social club); <u>United States v. Gotti</u>, 02 CR 606 (FB)(same).

Here, the government intends to question Agent Hagarty about just one recorded conversation in which members and associates of the Gambino family discuss criminal activities involving defendant Guerrieri, among others.  Absent explanation from a qualified expert, the tape will be confusing to the jury.

The Second Circuit's decision in <u>Locascio</u> also strongly supports this proposed use of expert testimony.  In that case, appellants Gotti and Locascio asserted that an F.B.I. agent's testimony, which included interpretations of "numerous surreptitiously taped conversations," was too "broad, sweeping, and unsubstantiated to be admissible."  6 F.3d at 936.  Holding that the admission of the agent's expert testimony was not manifestly erroneous, the Court stated that it is reasonable to assume that "jurors are not well versed in the structure and

methods of organized crime families." Id. at 937.  Indeed, a review of the expert testimony offered at the trial of Gotti and Locascio reveals the largely identical type of testimony as that expected from Agent Hagarty in the instant case.  At the Gotti and Locascio trial, F.B.I. Special Agent Lewis Schiliro provided expert testimony about the structure of organized crime and the types of criminal activity relied upon to sustain La Cosa Nostra.[5]  Agent Schiliro additionally provided an overview of the means and methods employed by organized crime to commit this criminal activity.  For example, Agent Schiliro described the internal hierarchy of the five organized crime families of La Cosa Nostra.  Exh. A at pp. 2005-2010.  Agent Schiliro additionally testified that the criminal activities sanctioned by La Cosa Nostra generally involve "gambling [and] loan sharking . . .," and provided details about the way in which these crimes were typically committed.  Exh. A at pp. 2012-2016.

Notably, Agent Schiliro also testified about the wiretap evidence.  An example of Agent Schiliro's testimony follows:

> Q:  Based upon your experience investigating organized
>     crime and supervising such investigations, have you
>     formulated opinions regarding many of these [tape-
>     recorded] conversations?

---

[5]    Attached hereto as Exhibit A are selected portions of Agent Schiliro's testimony in the trial of United States v. Gotti et al., 90 CR 1051 (ILG).

12

A:   Yes, I did.

Q:   Are you prepared to share some of your opinions with
     the jury?

A:   Yes.

***

Q:   Right at the beginning of the transcript the first
     words attributed to Gotti are:

         All right, let me tell you what Sam.  I want to
         throw out – excuse me.  I want to throw a few
         names out, five or six.

     Agent Schiliro, do you have an opinion regarding the
     subject of those conversations?

A:   Yes, I do.

Q:   What is your opinion?

A:   At this point in time, they are getting ready to induct
     a few members into the family and they are going to
     prepare a list of proposed members.

Exh. A at pp. 2018, 2026-2027.  Accordingly, Agent Schiliro

applied his expertise to decipher the coded and cryptic language

captured on the wiretaps to enlighten the jury.  Agent Schiliro

additionally provided expert testimony about the identity of

members of organized crime and information as to their current

status:

Q:   . . . Who is Joe "Piney"?

A:   Joe "Piney" . . . is the official underboss of the
     Gambino family.

Q:   Where is he as of January 4, 1990?

A:   He's in jail.

13

Q:    As a result of what?

A:    Joe "Piney" was convicted of a racketeering charge.

Exh. A at pp. 2032.

This use of expert testimony was similarly upheld in

the Amuso case.  21 F.3d at 1263.  The agent in Amuso testified

on "a broad range of topics including common cosa nostra

terminology necessary to explain tape recorded evidence, and the

existence and structure of New York crime families."  Id.[6]  See

also United States v. Carneglia, 47 Fed. Appx. 27, (2d. Cir.

2002)(upholding use of organized crime expert to give opinion on

organization and structure of organized crime as well as on tape

recordings); United States v. Gotti, 02 CR 606 (FB)(accepting

Agent Hagarty as an expert witness on organized crime, in

particular the Gambino family, and allowing him to offer his

opinion on several wiretap recordings).  Accordingly, the

testimony of Agent Hagarty is admissible and will provide

essential assistance to the jury in understanding the enterprise

and the one wiretap recordings that will be presented at the

upcoming trial.

---

[6]    Any conceivable prejudice resulting from Agent
Hagarty's testimony can be easily ameliorated by a jury
instruction to the effect that it is for the jury to weigh the
quality and credibility of expert opinions.

B.   Evidence Of Uncharged Predicate Acts in Support of the
Charged Racketeering

The government seeks to admit evidence of other criminal acts in which Ambrosio and Guerrieri participated as further proof of their role in the charged racketeering enterprise and conspiracy.  These acts fall into three categories: (1) gambling committed in furtherance of the charged conspiracy or serving as background evidence; (2) other loansharking and extortions and (3) prior incarceration. Further, evidence of the defendant's involvement in these crimes is also admissible pursuant to Federal Rule of Evidence 404(b). The evidence pertaining to these acts will come primarily, if not exclusively, from cooperating witnesses.

1.   Legal Standard

"It is well settled that in prosecutions for racketeering offenses, the government may introduce evidence of uncharged offenses to establish the existence of the criminal enterprise."  United States v. Baez, 349 F.3d 90, 93 (2d Cir. 2003)(upholding district court's admission of sixteen uncharged robberies); see United States v. Miller, 116 F.3d 641, 682 (2d Cir. 1997) (rejecting argument that introduction of uncharged murders should have been excluded under Federal Rule of Evidence 404(b) because such evidence may be admitted to prove "the existence and nature of the enterprise and the conspiracy").

15

Testimony concerning the association or membership and participation of the defendants in the Gambino family is admissible as direct proof of the crimes charged and need not be admitted as "other act" evidence within the meaning of Rule 404(b). "An act that is alleged to have been done in furtherance of the alleged conspiracy . . . is not an 'other act' within the meaning of Rule 404(b); rather, it is part of the very act charged." <u>United States v. Concepcion</u>, 983 F.2d 369, 392 (2d Cir. 1992). Thus, crimes committed in furtherance of the racketeering enterprise do not fall within the ambit of Rule 404(b). <u>See</u> <u>United States v. DiNome</u>, 954 F.2d 839, 843 (2d Cir. 1992) (evidence of uncharged murders admissible to prove relationship and continuity of RICO enterprise's illegal activities).

The Second Circuit's decision in <u>United States v. Wong</u>, 40 F.3d 1347 (2d Cir. 1994), is instructive. There, then District Court Judge Raggi permitted testimony of an uncharged shootout between rival gangs. In affirming the lower court, the Second Circuit noted that Judge Raggi ruled that:

> the evidence was admissible to prove the existence and nature of the Green Dragons enterprise and the participation of defendants-appellants in that enterprise, rather than as evidence of other crimes under Rule 404(b). The court determined that although other evidence had been admitted regarding the defendants' violent conduct, the challenged evidence was not cumulative because "there is no piece of evidence that

16

> the government has proffered that I do not
> expect will be subject to challenge, if not
> here during the evidentiary phase of trial,
> [then] during summations of counsel."

Id. at 1378. Echoing the district court's analysis, the Second

Circuit added, "this evidence was probative of the existence,

organization and nature of the RICO enterprise, a central

allegation in the indictment.  Accordingly, 'the fact that it may

also have been probative of a separate uncharged crime is

irrelevant.'" Id. at 1378 (quoting United States v. Coiro, 922

F.2d 1008, 1016 (2d Cir. 1991)).[7]

The Second Circuit re-affirmed its view of enterprise

proof in United States v. Diaz, 176 F.3d 52, 79 (2d Cir. 1999).

There, the defendants were charged with RICO violations based on

their participation in the "Latin Kings" street gang.  The

government introduced evidence of many uncharged crimes

undertaken in furtherance of the enterprise, including drug

trafficking, possession of weapons, assaults in aid of

racketeering, robbery and related acts of violence.  On appeal,

the defendants claimed that the district court erred by admitting

such evidence.  The Second Circuit rejected that claim, holding

that the acts constituted proof of the RICO enterprise and fell

outside Rule 404(b).  See id.

---

[7] The Second Circuit further held that the district court
acted well within its discretion in concluding the evidence was
admissible under Rules 401 and 403.

Finally, the Second Circuit decision in <u>Miller</u> upheld the district court's ruling to admit evidence of uncharged murders as proof of a RICO enterprise and conspiracy without regard to Rule 404(b). <u>Miller</u>, 116 F.3d at 682 ("The district court concluded that the proof of these murders was relevant to show the existence and nature of the enterprise and the conspiracy and that the probative value of the evidence was not substantially outweighed by its potential for unfair prejudice . . . we see no abuse of discretion here.").[8]

_____

[8] <u>See also</u> <u>United States v. Gonzalez</u>, 110 F.3d 936, 941-42 (2d Cir. 1997). There the defendants were charged with being felons in possession of a firearm. The court upheld admission of evidence regarding a burglary because it was relevant to both motive for defendants' possession of firearms and to provide "crucial background evidence that gave coherence to the basic sequence of events that occurred on the night" of defendants' arrest. In rejecting the defendant's claim to preclude this evidence pursuant to Rule 404(b), the court held:

> It is well established that "evidence of uncharged criminal activity <u>is not considered 'other crimes' evidence under Fed. R. Evid. 404(b)</u> if it 'arose out of the same transaction or series of transactions as the charged offense, if it [is] inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime [on] trial.'"

<u>Id</u>. (quoting <u>United States v. Towne</u>, 870 F.2d 880, 886 (2d. Cir. 1989)(emphasis added). Thus the evidence of the burglary was admitted pursuant to Rule 401, after the requisite inquiry under Rule 403 determined that the probative value of the evidence outweighed its prejudicial impact.

2.    <u>The Uncharged Crimes are Evidence of the
      Charged Conspiracy</u>

The government seeks to admit testimony from
cooperating witnesses, who were also co-conspirators, regarding
uncharged crimes in which Ambrosio and Guerrieri participated as
a member and in furtherance of the Gambino family.  The evidence
at issue here constitutes proof of the charged racketeering
enterprise and the conspiracy and its probative value is not
substantially outweighed by any prejudice.  The defendants'
involvement in these crimes is inextricably intertwined with the
evidence regarding the charged enterprise.  Further, the evidence
provides background to their relationships with other co-
conspirators.

a.   <u>Illegal gambling with Phillips and others</u>

The government seeks to admit evidence of Ambrosio and
Guerrieri's involvement in illegal gambling with Phillips and
Schwartz and Guerrieri's illegal gambling with his brother Tony
Lee.

The defendants involvement with Phillips was based
solely on the fact that Ambrosio and Guerrieri were affiliated
with organized crime.  Phillips turned to them in order to help
collect money and he in turn gave them a percentage of his net
earnings.  The gambling shows the beginnings of Ambrosio and
Guerrieri's trusted relationship with Phillips.  It also shows
the ways in which members and associates of the Gambino family

19

earned money.  Guerrieri's helping his brother with the gambling is further proof oh his knowing participation in the enterprise.

b.  <u>Other extortions and illegal gambling</u>

Guerrieri also told Phillips that he received protection payments from other gambling operations, an autobody shop and a junkyard.  These crimes are direct proof of the enterprise charged and the various ways in which defendant Guerrieri and Gambino family made money.  Ambrosio had a social club in which people played Continental or other cards games. Every week members and associates of the Gambino family would participate in this game.  This evidence is further proof of the workings of the enterprise.

c.  <u>Ambrosio's and Guerrieri's prior incarceration</u>

Without detailing the reason for either Ambrosio or Guerrieri's incarceration, the government intends on eliciting the fact that both were incarcerated for a short period of time. This evidence is necessary to explain Ambrosio and Guerrieri's absence in 1996 and the fact that Phillips began to make his payments to Anthony Ambrosio at Delta Collision, rather than continue paying the defendants.  The evidence helps fill in a chronological gap which would otherwise leave the jury confused and it provides background to the relationship between Phillips and Guerrieri and Ambrosio and Anthony Ambrosio.

Under <u>Wong</u>, <u>Diaz</u>, <u>Miller</u> and the other precedents

20

cited, the anticipated evidence should be admitted to prove that the enterprise charged in the indictment -- the Gambino family -- existed, and the relationship between Guerrieri, Ambrosio and other members and associates of the family.

>   3.   These Other Crimes are Also Admissible Pursuant to
>        Federal Rule of Evidence 404(b)

Alternatively, the enterprise proof outlined above is also independently admissible under Federal Rule of Evidence 404(b) both for background purposes and to show intent, motive, knowledge and absence of mistake or accident.

Federal Rule of Evidence 404(b) provides "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a  person in order to show action in conformity therewith. *It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.*" (emphasis added).  In Huddleston v. United States, 485 U.S. 681 (1988), the Supreme Court held that "the threshold inquiry a court must make before admitting similar acts evidence under Rule 404(b) is whether that evidence is probative of a material issue other than character.  The Court established a three prong analysis which district courts must undertake to determine whether evidence of extrinsic acts would create unfair prejudice: (1) whether under Rule 404(b), "the evidence be offered for a proper purpose"; (2) whether the evidence is relevant under Rules

402 and 104(b); and (3) whether under Rule 403 "the probative value of the similar acts evidence is substantially outweighed by its potential for unfair prejudice." Additionally, "the trial court shall, upon request, instruct the jury that the similar acts evidence is to be considered only for the proper purpose for which it was admitted." 485 U.S. at 692.

a.   The Second Circuit's inclusionary approach

The Second Circuit has incorporated the three-prong test and adopted an "inclusionary" approach to Rule 404(b). That is, "as long as the evidence is not offered to prove propensity, it is admissible," unless its prejudicial impact outweighs its probative value. United States v. Levy, 731 F.2d 997, 1002 (2d Cir. 1984); United States v. Pitre, 960 F.2d 1112, 1119 (2d Cir. 1992). While the government "must explain in detail the purposes for which the evidence is sought to be admitted," Levy, 731 F.2d at 1002 (2d Cir. 1978), the Second Circuit has emphasized that Federal Rule of Evidence 404(b) is a rule of broad reach and liberal application. Id. ("We have adopted the inclusionary or positive approach to [404(b)]; as long as the evidence is not offered to prove propensity, it is admissible.").

Applying this standard, it is plain that the testimony of the cooperating witnesses concerning prior criminal acts of Ambrosio and Guerrieri is admissible under Rule 404(b). The proffered evidence is clearly relevant to establish motive,

22

opportunity, identity, knowledge, plan and absence of mistake.

Further, at trial, the defense can be expected to argue, among

other things, that the cooperating witnesses are purposely

fabricating stories and pointing the finger at the defendants in

order to curry favor with the government.  The prior criminal

conduct discussed above refutes this point.

> b.  Evidence offered to show background,
>     complete the story, and show relationships
>     of trust under 404(b)

The Second Circuit has repeatedly sanctioned that

evidence of how members of a conspiracy met, committed crimes

together, and grew to trust each other over time is relevant to

explain the relationships between members of the conspiracy.

Accordingly, in United States v. Williams, 205 F.3d 23 (2d Cir.

2000), the Second Circuit upheld the admissibility of evidence

relating to the defendant's prior criminal activities --

including marijuana distribution, credit card fraud and filing

false charges of assault -- with two co-conspirators involved in

the charged conspiracy to distribute cocaine.

In reaching this conclusion, the Second Circuit held

that "evidence of [the defendant's] prior criminal conduct with

his co-conspirators was relevant to 'inform the jury of the

background of the conspiracy charged, to complete the story of

the crimes charged, and to help explain to the jury how the

illegal relationship between the participants in the crime

23

developed.'" <u>Williams</u>, 205 F.3d at 33-34 (quoting <u>Pitre</u>, 960
F.2d at 1119); <u>United States v. Rosa</u>, 11 F.3d 315, 33-334 (2d
Cir. 1993) (holding that codefendants' relationship over a 14-
year period, during which stolen property and narcotics crimes
were committed, "was properly admitted to explain how the illegal
relationship between the two [defendants] developed and to
explain why [one defendant] . . . appointed [the other
defendant] . . . to a leading position in the Organization");
<u>United States v. Pipola</u>, 83 F.3d 556, 566 (2d Cir. 1996)(evidence
of prior uncharged armed robberies admitted to show the
defendant's leadership role in relation to his coconspirators);
<u>United States v. Brennan</u>, 798 F.2d 581, 590 (2d Cir. 1986).

In <u>Brennan</u>, for example, the defendant was a former
Supreme Court justice of New York State charged with fixing four
criminal cases in Queens.  798 F.2d at 583.  The government's
central witness was Anthony Bruno, who served as a middleman
between the state court defendants and then-Justice Brennan.  <u>Id</u>.
The contested evidence involved the alleged fixing by Brennan and
Bruno of three criminal cases not charged in the indictment.  <u>Id</u>.
at 589.  The Second Circuit affirmed the admission of this
evidence, reasoning that it "helped explain to the jury how the
illegal relationship between Brennan and Bruno developed . . .
[and] was integral to an understanding of Bruno's and Brennan's
involvement in [two of the cases charged in the indictment]."

24

<u>Id</u>. at 590.  "Without this evidence," the Court added, "the jury would have had a truncated and possibly confusing view . . . of the basis for the trust between Brennan and Bruno."  <u>Id</u>..

Again, these other criminal acts are relevant to explain the relationships between Phillips and Ambrosio and Guerrieri as well as between Guerrieri and other member of the Gambino family and inform the jury of the background of the conspiracy charged and the ways in which the organization made money and enforced its rules.  The acts complete the story of the crimes charged and help explain to the jury how the illegal relationship between the participants in the crime developed. <u>See</u> <u>William</u>, 205 F.3d at 33-34.

  4. The Probative Value Of the "Other Crimes" Evidence
   <u>Far Outweighs Any Prejudicial Effect</u>

Finally, the probative value of these uncharged acts is not substantially outweighed by their prejudicial effect. Evidence of other crimes is admissible when offered for a proper purpose through the various types of evidence, including the testimony of cooperating witnesses so long as the evidence "'[does] not involve conduct any more sensational or disturbing than the crime[] with which [the defendant has been] charged.'" <u>Pitre</u>, 960 F.2d at 1120 (quoting <u>United States v. Roldan-Zapata</u>, 916 F.2d 795, 804 (2d Cir. 1990).  Where the uncharged crimes are similar in nature to the charged crimes, Rule 404(b) evidence is admissible under the Rule 403 balancing test.  <u>See</u> <u>United States</u>

25

v. Livoti, 196 F.3d 322, 326 (2d Cir. 1999) (upholding admissibility of evidence that the defendant, a police officer charged with engaging in excessive use of force with arrestee, choked another arrestee on the basis that "the evidence did not involve conduct more inflammatory than the charged crime, and the district court gave a careful limiting instruction").

As noted above, the other acts are no more prejudicial than that for which the defendants have been charged. Further the evidence relating to the other criminal acts listed above will come primarily from the testimony of cooperating witnesses. Accordingly, the quality of the evidence is no more prejudicial than that offered with regard to the other charged crimes. See United States v. Mejia-Velez, 855 F. Supp. 607, 611 (E.D.N.Y. 1994) (Korman, J.) ("If the jury found these witnesses to be credible, the defendant would be convicted even if the accomplices were not permitted to testify about [the uncharged crimes]"). Further, any potential prejudice to the defendants can be effectively mitigated by a cautionary instruction limiting the jury's consideration of the evidence to the purposes for which it is offered. See, e.g., United States v. Mickens, 926 F.2d 1323, 1328-29 (2d Cir. 1991).

C.   Admission of Coconspirator Statements

The government seeks to admit coconspirator statements through the testimony of cooperating witnesses. Federal Rule of

Evidence 801(d)(2)(E) permits the admission of a statement offered against a party as non-hearsay if it is made "by a coconspirator of [the] party during the course and in furtherance of the conspiracy."  The admission of such statements requires a showing, by a preponderance of the evidence, that a conspiracy existed that included the defendant and the declarant and that the statement was made during the course of and in furtherance of that conspiracy.  <u>United States v. Gigante</u>, 166 F.3d 75, 82 (2d Cir. 1999); <u>see also</u> <u>United States v. Orena</u>, 32 F.3d 704, 711 (2d Cir. 1994).  Admission of such statements does not violate the Confrontation Clause of the Sixth Amendment.  <u>See</u> <u>Bourjaily v. United States</u>, 483 U.S. 171, 182 (1987).

The Second Circuit recently explained that the "coconspirator-in-furtherance exception has its roots in the law of agency, . . . [t]hus, when two people enter into a joint venture of a conspiratorial nature, the actions and utterances of either done in furtherance of that conspiracy are deemed authorized by the other."  <u>United States v. Russo</u>, 302 F.3d 37, 45 (2d Cir. 2002).  The "objective of the joint venture need not be the crime charged in the indictment," so long as the statement being offered seeks to advance an objective of a joint venture in which the declarant and the defendant are both engaged.  <u>Id</u>.  Notably, with respect to organized crime cases, the court in <u>United States v. Gigante</u>, 166 F.3d 75, 82 (E.D.N.Y.

27

1997), recognized that "[t]he conspiratorial ingenuity of La Cosa Nostra expands the normal boundaries of a criminal enterprise, and Rule 801(d)(2)(E) must expand accordingly to encompass the full extent of the conspiracy." Id.

A statement is in furtherance of the conspiracy if it is intended to prompt the listener, who need not be a coconspirator, to respond in a way that promotes or facilitates the carrying out of criminal activity. See United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1199 (2d Cir. 1989). Statements that provide reassurance, that seek to induce a coconspirator's assistance, that serve to foster trust and cohesiveness, or that inform coconspirators as to the progress or status of the conspiracy are all in furtherance of the conspiracy. See, e.g., United States v. Thai, 29 F.3d 785, 814 (2d Cir. 1994); United States v. Rahme, 813 F.2d 31, 35-36 (2d Cir. 1987).

The Second Circuit has repeatedly held that in the context of an organized criminal group, Rule 801(d)(2)(E) must be read to encompass statements made regarding the structure, status, membership and operation of the enterprise.  For example, in United States v. Orena, 32 F.3d 704, 712-714 (2d Cir. 1994) (Weinstein, J.), the district court admitted certain statements by cooperating witnesses concerning an over-arching conspiracy between the Colombo organized crime family and other families

28

represented on the Commission of major organized crime families

under Rule 801(d)(2)(E).  <u>Id</u>.  The court commented at a side-bar

that:

> These gangs in order to operate properly must
> be fully informed of each other's activities.
> As part of the action in encouraging the
> interrelationship among the gangs and members
> of the gangs, a certain amount of this
> conversation is required. . . . It's very
> important in keeping up the morale of the
> group and in insuring that all the members of
> the group feel important and feel that
> they're protected in an ongoing conspiracy.

<u>Id</u>. at 713.  The defendant objected to the admission of the

statements and to the district court's comments quoted above.  On

appeal, the district court's ruling was affirmed.  The Court of

Appeals found that the conspiracy underlying the coconspirator

statement need not be identical to the conspiracy charged in the

indictment.  <u>Id</u>.  The Court further held that there was "ample

evidence to support the existence of a conspiracy embracing the

Colombo Family and other families represented on the Commission,"

and that the "Commission superintends and regulates affairs of

the five Cosa Nostra families in New York City."  <u>Id</u>.  Finally,

the Court found that both the disputed statements and the

district court's comments were proper under Rule 801(d)(2)(E),

because that rule "encompasses statements that 'serve to foster

trust and cohesiveness [among coconspirators], or inform each

other as to the progress or status of the conspiracy.'"  <u>Id</u>.; <u>see</u>

<u>also</u> <u>Russo</u>, 302 F.3d at 46; <u>United States v. Salerno</u>, 868 F.2d

524, 535 (2d Cir. 1989).

This approach to the admissibility of coconspirator statements in the context of organized crime was reaffirmed in Russo. The Russo decision, which involved the prosecution of a member of the Colombo Family in this District, made clear that coconspirator statements are admissible in the organized crime context where the defendant and the declarant were involved in a conspiracy to maintain an organized crime syndicate and the declarant's statement furthered the survival of the syndicate by providing associated persons information about its structure and membership:  "Such an organization [the Colombo Family] cannot function properly unless its members and persons who do business with it understand its membership, leadership and structure.  The operation of such a syndicate requires that information be passed among interested persons, advising them of the membership and the hierarchy."  302 F.3d at 46.

More recently, Judge Glasser applied the Russo holding to a case involving members and associates of the Genovese Family and held recordings of coconspirator statements were admissible. See United States v. Imbrieco, Case No. 02-CR-47, 2003 WL 1193532 (E.D.N.Y. Jan. 13, 2003).  His analysis makes clear that statements of members and associates of an organized crime family pertaining to the maintenance and operation of that family are admissible under the coconspirator exception as interpreted by

30

<u>Russo</u>.

Judge Glasser first concluded that the enterprise charged in <u>Imbrieco</u> was not the Mafia at large but rather a specific organization, the Genovese Family.  In concluding that the Genovese Family was a conspiracy for purposes of Rule 801(d)(2)(E), Judge Glasser wrote:

> The members and associates of that enterprise functioned as a continuing unit and the objective of that enterprise was to make money for its members and associates by the commission of a wide variety of crimes.  The definition of a conspiracy, namely, an agreement between or among two or more persons to commit a crime, applies precisely to the enterprise alleged in this indictment to be the Genovese organized crime family. The defendants are alleged to be associates of the Genovese family.  Having associated themselves with that enterprise, it follows that they agreed to abide by its rules and to participate in its activities and further it objectives.  In its essence, this enterprise -- this association of the defendant and the declarants in fact in what is alleged to be the Genovese family -- is the paradigm of a partnership or joint venture for criminal purposes.

<u>Imbrieco</u>, 2003 WL 1193532, at *4. Accordingly, he held that tape recordings of conversations of coconspirators were admissible. This analysis applies to the present case.

Here the government seeks to introduce evidence about the crimes charged as well as evidence of uncharged crimes through cooperating witnesses who were also coconspirators. These witnesses will testify not only about events about which

they have first-hand knowledge, but also about facts told to them by co-conspirators.  All the witnesses' testimonies relate to acts that were committed in furtherance of that joint criminal venture--the Gambino family-- and therefore are clearly admissible under the precedents cited above.

Further, the government intends to offer excepts from two tapes as coconspirator statements.  First, the government intends to offer a recording of a conversation that occurred on May 7, 1999 between Sal Gerrato and Chris Phillips.  In the conversation, Gerrato relays a message from Ambrosio and Guerrieri to Phillips about their displeasure with Phillips because of his failure to pay them money.

Second, the government intends to offer a recording of a conversation that occurred on May 13, 1999 between Dominick Pizzonia, Gene Gotti and Anthony Ambrosio.  During the conversation, Gotti and Pizzonia discuss Guerrieri's loansharking activities in the context of Gambino family business.

These conversations are admissible as evidence of the charged enterprise.  The conversations serve to "foster trust and cohesiveness among coconspirators" and to "inform each other as to the progress or status of the conspiracy."  See Orena 32 F.3d at 712-714.

In addition, the government seeks to introduce all or portions of approximately twenty audio-recordings and one video-

tape involving members of the Gambino family.   The audio-
recordings capture conversations which occurred either over the
telephone or during in-person meetings.   The portions of the
recordings that the government seeks to introduce involve
conversations primarily between the defendants and Phillips that
were intercepted as the result of electronic surveillance.   The
recordings include discussions about Phillips's obligation to pay
money to the defendants and other members and associates of the
Gambino family.   Under Rule 801(d)(2), any statement made by
either of the defendants which is offered by the government at
trial is admissible against that defendant as the statement of a
party-opponent.   However, these statements are also admissible
against the co-defendant because they are coconspirator
statements.

    D.   Evidence Regarding the Rehabilitation of
         the Government's Cooperating Witnesses

        The government will seek to admit at trial evidence to
rehabilitate witnesses whose credibility has been attacked by the
defense.[9]  In particular, the government will move to admit
evidence pertaining to the witnesses' cooperation against persons
other than the defendants if defense counsel suggest that the
witnesses have falsely testified about the defendants in order to

---

     [9]  If the credibility of the government's witnesses is
attacked, the government plans to rehabilitate the witnesses
using prior consistent recorded statements that have been
previously provided to the defendants.

receive a sentence reduction.  This evidence is relevant to rebut a claim that the witnesses have falsely implicated the defendants in order to obtain a cooperation agreement with the government that could not have been obtained without such cooperation.

The Second Circuit has repeatedly admitted such evidence.  For example, in United States v. Martinez, 775 F.2d 31, 36 (2d Cir. 1985), the Second Circuit held that during redirect examination of a cooperating witness, the government may introduce evidence that other defendants have pled guilty as a result of the witness's cooperation.  The Court explained that such evidence was relevant to show that the testimony of the cooperating witness "was worthy of belief or whether, instead, [the witness] typically fabricated the wrongdoings with which he charged others and had fabricated the story against [the defendant] in hope of gaining a reduction of his own sentence." Id.  The Court further noted that "it is well settled that a cross-examination attacking a witness's credibility and character will open the door to redirect examination rehabilitating the witness."  Id.

In United States v. Lindemann, 85 F.3d 1232 (7th Cir. 1996), the Seventh Circuit similarly admitted evidence on redirect examination that a cooperating witness had provided information that lead to the conviction of other defendants.  In Lindemann, the defense attorney suggested during the cross-

34

examination of a cooperating witness that the witness would not have obtained a cooperation agreement without having incriminated the defendant.  On redirect examination, the government elicited the full scope of its investigation, the number of persons against whom the defendant had cooperated, and the fact that ninety percent of the charged defendants had pled guilty.  Id. at 1242.[10]  In affirming the defendant's conviction, the Seventh Circuit noted that the defendant had attacked the credibility of the government's cooperating witness in an effort to show bias in favor of the government, and that the government was thus entitled to offer rehabilitating evidence to repel that attack. Id.

---

[10]    The district court in Lindemann gave the jury a limiting instruction, telling the jury that the fact that other defendants had pled guilty did not lead to an inference that the defendant on trial was guilty, and that the evidence of the other defendants' guilty pleas was offered to explain the scope of the witness's cooperation.  Id.  In United States v. Scott, 267 F.3d 729, 733 (7th Cir. 2001), the Seventh Circuit also permitted the government to elicit testimony from the cooperating witnesses about the information they provided about other defendants and targets.

## CONCLUSION

For the reasons outlined above, the Court should grant the government's _in_ _limine_ motion to admit:

Respectfully submitted,

ROSLYNN R. MAUSKOPF
United States Attorney
Eastern District of New York

Mitra Hormozi, AUSA
Deborah Sue Mayer, AUSA
Assistant United States Attorneys
(Of counsel)

36